**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHICAGO TEACHERS UNION, | |
| Plaintiff, | |
| v. | No. 20-cv-02958 |
| | Judge John F. Kness |
| BETSY DEVOS, in her official capacity as the Secretary of the United States Department of Education; UNITED STATES DEPARTMENT OF EDUCATION; and BOARD OF EDUCATION OF THE CITY OF CHICAGO, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

This case concerns one of the myriad challenges presented by the COVID-19 crisis: how best to teach children—specifically those who need special services—during a time when the schoolhouse door remains closed for safety. In this one-count action, CTU alleges that the Secretary of the United States Department of Education, the Department itself, and the Board of Education of the City of Chicago violated the Administrative Procedures Act ("APA") by not asking Congress for authority to waive certain documentation requirements relating to special education and services for children. According to CTU, by "failing to waive" these requirements, Defendants have acted arbitrarily and capriciously and caused CTU's members to be "diverted" by a "massive bureaucratic distraction." CTU seeks a temporary restraining order

and preliminary injunction relieving CTU members from the obligations that Defendants have allegedly refused to waive.

Although the Court is sympathetic to the challenges inherent in providing remote special education and services, the legal deficiencies in CTU's case are rife. As explained below, CTU likely lacks standing to proceed in federal court. CTU also faces significant barriers under the APA, and with respect to the Board of Education, CTU has not pleaded a viable independent claim. CTU has thus not met the threshold requirement for an injunction of showing some likelihood of success on the merits of its case. As a result, the Court denies CTU's motion for preliminary injunctive relief.

## I.   BACKGROUND

For children who require special education and services, two provisions of federal law are particularly relevant: the Individuals with Disabilities Education Act ("IDEA") (20 U.S.C. § 1400, *et seq*.) and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 701, *et seq*.). Children who are eligible for special education and services under the IDEA must be provided an "individualized educational program," or "IEP." 20 U.S.C. § 1401(9)(D), (14). An IEP "is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist., RE–1*, — U.S. —, 137 S. Ct. 988, 994 (2017) (quoting *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)). The IEP "sets out the child's present academic and functional performance, establishes measurable academic and functional goals for the child, and states the special education and related services that will be provided

for the child." *Middleton v. D.C.*, 312 F. Supp. 3d 113, 121 (D.D.C. 2018) (citing 20 U.S.C. § 1414(d)(1)(A)).

Every IEP must be drafted by a team that includes the child's parents or guardians, the child's teacher, a representative of a local educational agency, and, whenever appropriate, the child. 20 U.S.C. § 1414(d)(1)(B). This team reviews the child's progress "periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved." *Id*. § 1414(d)(4)(A)(i). Further, the IEP team is required to "revise[] the IEP as appropriate to address," among other things, "any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate; [or] . . . the child's anticipated needs; or . . . other matters." *Id*. § 1414(d)(4)(A)(ii). At a minimum, the IEP must be "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.

It is undisputed that the COVID-19 pandemic has upended nearly every aspect of American life, and education is no exception. In attempting to address the nationwide effects of the pandemic, Congress passed the Coronavirus Aid, Relief and Economic Security Act ("CARES Act") (Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020). It constitutes both the largest economic stimulus package in United States history and an effort to adapt laws and practices to current circumstances. To this latter end, the CARES Act effected modifications to laws and regulations governing the administration of healthcare, taxes, entitlement benefits, mail delivery, student loans, retirement planning, credit reporting, and—most pertinently here—education.

3

*Id.*

To fit existing federal education regulations to these changed circumstances, Congress allowed the Secretary to waive select, specifically-enumerated statutory and administrative rules. *Id.* § 3511(a), (b). Not included was the IDEA/Rehabilitation Act requirement that school districts provide free and appropriate public education ("FAPE")—the provision from which are derived regulations requiring schools to prepare IEPs. 20 U.S.C. § 1400(d)(1)(A); 34 C.F.R. §§ 300.201, 300.320-22. But Congress was not completely silent concerning provisions not addressed by the CARES Act: rather, Congress instructed the Secretary to recommend "any additional waivers . . . the Secretary believes are necessary to be enacted into law to provide flexibility to States and local educational agencies to meet the needs of students." *Id.* § 3511(d)(4).

On April 27, 2020, the Secretary submitted her recommendations. R. 10-1.[1] Although the Secretary's report to Congress addressed a number of issues, it did not include a recommendation that the learning plan requirements be waived. *Id.* Quite the opposite: the Secretary explicitly stated that "[t]he Department is not requesting waiver authority for any of the core tenets of the IDEA or Section 504. . . ." *Id.* at 14. According to the report, the Department's position was based on the following "principles":

> • Schools can, and must, provide education to all students, including children with disabilities;

---

[1] "R. __" denotes a citation to the docket.

• The health and safety of children, students, educators, and service providers must be the first consideration;

• The needs and best interests of the individual student, not any system, should guide decisions and expenditures;

• Parents or recipients of services must be informed of, and involved in, decisions relating to the provision of services; and

• Services typically provided in person may now need to be provided through alternative methods, requiring creative and innovative approaches.

*Id.*

On May 19, 2020—three weeks after the Secretary issued her recommendations—CTU filed this one-count action against the Department of Education, the Secretary in her official capacity, and the Board of Education of the City of Chicago (the "Board"), for alleged violations of Section 706 of the Administrative Procedures Act (5 U.S.C. § 551, *et seq*.). R. 1.[2] CTU asserts that the Secretary acted arbitrarily and capriciously when she declined to exercise her authority under the CARES Act to recommend waiving provisions of the IDEA and Section 504. According to CTU, those provisions require CTU's members to draft remote learning plans for students with special education needs before the end of the current school year. *Id.* ¶¶ 1-5.

CTU joined the Board as "an indispensable party defendant for purposes of

---

[2] The Court has subject matter jurisdiction in this federal-question case under 28 U.S.C. § 1331 and 28 U.S.C. § 1346. *Dhakal v. Sessions*, 895 F.3d 532, 538 (7th Cir. 2018); *Builders Bank v. FDIC*, 846 F.3d 272, 274 (7th Cir. 2017).

injunctive relief." *Id*. ¶ 9. CTU contends that the Board "is currently requiring what appear[s] to be wholesale drafting from scratch of new remote learning plans to replace the current existing IEP's and Section 504 plans." R. 10 ¶ 4. Further, according to CTU, "[b]oth the Secretary and the . . . Board . . . are aware or should be aware that the requirement to re-write all these plans in a few weeks is impossible to meet, but [they] have nonetheless chosen to keep in place such requirement so as to give themselves political and legal cover from criticism." *Id*. ¶ 18.

On May 27, 2020, CTU filed a motion for a temporary restraining order and a preliminary injunction. *Id*. On the parties' joint motion (R. 12), the Court entered an agreed briefing schedule (R. 13); briefing was completed on June 9, 2020. On June 12, 2020, the Court held a telephonic hearing at which all parties appeared and presented argument. R. 26.

CTU's motion seeks preliminary injunctive relief that: (1) bars all defendants from "requiring the case managers, clinicians, and other professionals in the Chicago public schools . . . to draft new remote learning plans in the few weeks remaining the current school year"; and (2) orders the Board "to provide notice to such case managers, clinicians, and others including parents as soon as possible that they are relieved from these new and unnecessary obligations." R. 10 ¶ 28. For the reasons that follow, the motion is denied.

## II.  LEGAL STANDARD

As an equitable, interlocutory form of relief, the entry of a preliminary injunction "is an exercise of a very far-reaching power, never to be indulged in except

in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (citation and quotation marks omitted); *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (preliminary injunction "is an extraordinary remedy" that "is never awarded as a matter of right"). "The standards for granting a temporary restraining order and preliminary injunction are the same." *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 (N.D. Ill. 2019) (collecting cases).

In determining whether to impose a preliminary injunction, a district court "engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts*, 549 F.3d at 1085–86. There are three requirements the moving party must satisfy in the threshold phase: (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Id.*

If the moving party succeeds at the threshold phase, the Court moves to the balancing phase. In that phase, the Court "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts*, 549 F.3d at 1085–86. This requires "a sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it

weigh in his favor.'" *Id.* (quoting *Roland Mach.*, 749 F.2d at 387). "Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Id.* (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).

Plaintiffs seek a mandatory preliminary injunction requiring an affirmative act by the defendant. Because a mandatory injunction requires the Court to command the defendant to take a particular action, it is "cautiously viewed and sparingly issued." *Knox v. Shearing*, 637 F. App'x 226, 228 (7th Cir. 2016) (nonprecedential disposition) (quoting *Graham v. Med. Mut. of Ohio,* 130 F.3d 293, 295 (7th Cir. 1997)); see also *W. A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) ("mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds") (quotation marks and citation omitted).

## III. ANALYSIS

In its complaint and written motion for a preliminary injunction, CTU maintains that the Court should require the Secretary to ask Congress for the authority to waive certain requirements under the IDEA and Section 504. During the June 12 motion hearing, however, CTU's theory evolved slightly: CTU now appears to seek a declaration that federal law does not require the Board to demand that all IEPs be reviewed by the time the school year ends on June 22. Indeed, the urgency that CTU exhibits appears driven most directly by the impending end of the school

8

year—and this suggests that CTU might settle for an advisory order telling the parties how this Court reads the applicable rules.

Under any construction of CTU's prayer for relief, a preliminary injunction is unwarranted. Bluntly put, CTU's likelihood of success on the merits is too low to pass the threshold for relief. Several infirmities are apparent: (1) CTU likely lacks standing to proceed in federal court; (2) the decision of the Secretary not to seek additional waiver authority is beyond the power of this Court to countermand; and (3) CTU has not pleaded a viable standalone claim against the Board. Because CTU has not shown some likelihood of success on the merits, the Court "must deny" the motion for preliminary relief. *Girl Scouts*, 549 F.3d at 1086.

### A.    CTU is Unlikely to Succeed on the Merits

#### 1.    *CTU is Unlikely to Establish Standing*

CTU brought this case on a straightforward theory: that the Secretary and the Department (the "Federal Defendants") arbitrarily and capriciously "abused the discretion granted [them] by the CARES Act to temporarily waive" provisions requiring the review and revision of IEPs. R. 1 ¶ 5. In CTU's view, the Secretary's conduct has prompted the Board to require—to the detriment of teachers, students, and parents—the wholesale redrafting of IEPs into "Remote Learning Plans" ("RLPs") during the short time left in the current school year. CTU contends that the Federal Defendants' conduct irrationally refused to take advantage of their "authority to waive certain administrative requirements" provided by Congress "so as to give themselves political and legal cover from criticism." R. 10 ¶ 18.

9

CTU's theory, however, fails to characterize properly what Congress provided in the CARES Act. Although Section 3511 provided for the waiver of some regulatory provisions not relevant here, the "authority to waive" IEP-related rules that CTU says was given to the Federal Defendants does not exist. On the contrary, Section 3511 merely directed the Secretary to provide Congress with "recommendations on any additional waivers . . . the Secretary believes are necessary to be enacted into law to provide limited flexibility to States and local educational agencies to meet the needs of students during the emergency. . . ." CARES Act, Div. A § 3511(d)(4).

That Congress chose to frame the issue of regulatory flexibility as a request for a *recommendation* for possible future legislative action calls into serious doubt CTU's standing to bring this action. A plaintiff who seeks to proceed in federal court must, of course, demonstrate "injury in fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision." *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008) (citations and quotation marks omitted). Meeting *each* of these factors—injury, causation, and redressability—is mandatory. *Id*. As explained below, the Court has doubts about CTU's likelihood of success in meeting these three requirements.

    a.   <u>Redressability</u>

Turning first to redressability, the Supreme Court has explained that the inquiry focuses on whether it is "likely," not just "speculative," that the alleged harm "will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 561 (1992). A plaintiff "bear[s] the burden of establishing standing, and each element, including redressability, must be supported by more than unadorned speculation." *Plotkin v. Ryan*, 239 F.3d 882, 885 (7th Cir. 2001).

At this preliminary stage, CTU has failed to establish that an order of any sort that the Court might issue would likely redress CTU's alleged harm. If anything, CTU's pleadings and arguments establish a *lack* of redressability. Section 3511 unequivocally shows that Congress reserved to itself whether to enact into law any additional waivers under the IDEA or Rehabilitation Act. All that Congress directed the Secretary to do was to provide her "recommendations on any additional waivers" that she "believes are necessary to be enacted into law. . . ." CARES Act, Div. A § 3511(d)(4). It is impossible to draw from this language any reasonable inference that Section 3511 provided the Secretary with the independent authority to waive binding law.

Nor can relief be found in an order compelling the Secretary to make a recommendation to Congress to provide additional waiver authority. Congress is a coordinate branch of government vested with "all legislative Powers"—that is, the power to draft positive laws. *See Gundy v. United States*, — U.S. —, 139 S. Ct. 2116, 2123 (2019). Congress may, in its sole discretion, obtain "the assistance of its coordinate Branches" in fulfilling its duties. *Id*. (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). But inviting a suggestion is a far piece from affirmatively *acting* on that suggestion. Indeed, Congress could react to a suggestion by the Secretary for additional waiver authority in any number of ways, including by

11

(1) writing legislation that grants additional waiver authority; (2) affirmatively refusing to grant additional authority; (3) granting waiver authority short of what CTU prefers; or (4) completely ignoring the Secretary's suggestion.

Similar unpredictability would obtain even if Congress were disposed to grant a request from the Secretary for waiver authority. There is no way for the Court to predict whether Congress would, or even could, act before the end of the CPS school year, or even before the end of the COVID-19 emergency; whether the President would sign or veto the legislation; or whether any veto would be overridden. In short, these considerations, which merely reflect an acknowledgment both of the plain language of Section 3511 and the manner in which any further legislative waivers must be created, make it wholly speculative that CTU's requested relief would provide redress for its grievance. *See Plotkin*, 239 F.3d at 885. Accordingly, the Court finds that Plaintiff will likely fail the meet the redressability requirement of the test for standing.

b.  <u>Causation</u>

In addition to the question of redressability, the Court doubts that Plaintiff can show a "causal connection between the injury" and the Federal Defendants' conduct. *Disability Rights Wis., Inc.*, 522 F.3d at 802; *Duberry v. District of Columbia*, 924 F.3d 570, 581 (D.C. Cir. 2019) (causation and redressability "are closely related[,] like two sides of a coin") (citation and quotation marks omitted). To begin, the independent actions *vel non* of Congress and the Board interrupt the causal chain between CTU's asserted injury and the actions of the Federal Defendants. As explained above,

12

Congress is not obligated to do anything even if the Secretary makes a recommendation for further waiver authority. And as the Federal Defendants argue, nothing precludes Congress from granting additional waiver authority at its own instance. This lack of clarity in predicting how Congress might act presents a significant break in the causal chain between CTU's injury and the lack of a recommendation for waiver authority. *See Doe v. Holcomb*, 883 F.3d 971, 979 (7th Cir. 2018) (plaintiff failed to show causation where a county clerk lacked the power to grant or deny a name-change petition). Because the Federal Defendants lack this power, CTU's asserted injury is not "fairly traceable" to the complained-of conduct (or lack of it) by the Federal Defendants. *See id*.

By the same token, the conduct of the Board is an intervening event that (arguably) also breaks the chain of causation. *Dep't of Commerce v. New York*, — U.S. —, 139 S. Ct. 2551, 2566 (2019) (noting the Court's "steady refusal to endorse standing theories that rest on speculation about the decisions of independent actors") (quotation omitted). As the Federal Defendants explain, administration of the IDEA involves a complex balance between federal, state, and local conduct. States play a significant role in ensuring that "local educational agencies" such as the Chicago Public Schools comply with the IDEA, *e.g.* 20 U.S.C. § 1416(a)(1)(C), and if a state identifies noncompliance by a school district, the state must ensure correction as soon as possible—but at least within one year. *See* 34 C.F.R. § 300.600(e). Parents also play a role in the enforcement of the IDEA, by challenging a school district's actions through, first, a due process complaint in a state administrative hearing system, and

13

second, if necessary, by filing a federal action after exhausting their administrative remedies. *See* 20 U.S.C. § 1415(b)(6), (f), (g), (i)(2)(A).

This statutory and administrative scheme, therefore, places at least three levels of operational authority between the Federal Defendants and CTU: federal to state; state to local; and local to employees (CTU). It is apparently undisputed that the deadlines and tasks of which CTU complains were communicated to CTU members by the Board; there is no suggestion that the Federal Defendants have communicated directly to CTU or its members concerning their obligations with respect to the redrafting of IEPs into remote learning plans. These degrees of separation cast further doubt on whether CTU has adequately shown causation.

Finally, the Board likely has discretion under the IDEA to take a more expansive (or at least a different) view than the Federal Defendants of what is required under federal law. Although the parties dispute this point, the Court is satisfied, at least at this early stage, that the Board is not required to take a lockstep approach with the Federal Defendants concerning whether the IDEA requires the redrafting of IEPs. *See, e.g., T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 468 (9th Cir. 2015). This discretion bolsters the Court's view that any injury arising from the Board's requirement to redraft IEPs is not fairly traceable to the conduct of the Federal Defendants.

c.     Injury in Fact

As to the final component of standing, the Court doubts that CTU can show it has suffered an injury in fact sufficient to confer standing. *See Lujan*, 504 U.S. at 560

(asserted injury must be "concrete and particularized" and "actual or imminent"). If one point comes across clearly from CTU's allegations, it is that CTU believes children and parents are being harmed by the requirement to redraft IEPs into RLPs before the imminent conclusion of the school year. That allegation may or may not be correct: this Court lacks the institutional competence to opine on whether RLPs are "useless paperwork" (as CTU contends) or an important part of a child's education (as the Board contends). *See, e.g., United States v. Bd. of Sch. Comm'rs of City of Indianapolis*, 128 F.3d 507, 510 (7th Cir. 1997) ("The administration of public schools is a state executive function rather than a federal judicial function, and so ought not to be subjected to the perpetual tutelage of the federal courts"); *Bd. of Educ. of Oklahoma City Pub. Sch., Indep. Sch. Dist. No. 89, Oklahoma Cty., Okl. v. Dowell*, 498 U.S. 237, 248 (1991) ("Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs"). What the Court must do instead is consider whether CTU has the right to raise these claims in a federal court.

Without deciding the issue conclusively at this stage, the Court doubts that CTU has alleged a cognizable injury. CTU has framed its case as seeking to protect the rights of students and parents—not, primarily, as an effort to protect the interests of CTU members. But in choosing this approach, CTU has engendered a genuine question as to whether it has the right to assert claims on behalf of those absent parties. *See, e.g., Lawrence Twp. Bd. of Educ. v. New Jersey*, 417 F.3d 368, 371 (3d Cir. 2005) (statutory language of the IDEA suggests "Congress intended to provide a

15

private right of action only to disabled children and their parents"); *cf. Evans v. Kansas City, Mo. Sch. Dist.*, 65 F.3d 98, 101 (8th Cir. 1995) (teacher lacked standing to bring Title VII discrimination claims on behalf of students).[3] Although the Court does not put much weight on the injury-in-fact component at this stage, CTU's failure to make a more compelling injury argument also cuts against its likelihood of success on the merits.

*     *     *

As explained above, Plaintiff has failed to show some likelihood that any judicial order will redress CTU's grievance. Nor has CTU shown a likelihood of success on its contention that the asserted injury is fairly traceable to the conduct of the Federal Defendants. Finally, the Court doubts that CTU will be able to demonstrate that it suffered a cognizable injury in its own right.

As is obvious, the Court has phrased these findings concerning standing as preliminary, not final. This is for several reasons: the urgency of CTU's request for a preliminary injunction, the compressed briefing schedule, that the Defendants raised the issue of standing by way of a pending motion to dismiss, and that the Court has called for additional briefing on the motion to dismiss—which all suggest to the Court that it would be premature to make a final decision on standing at this preliminary stage. *See Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (the Court "has

---

[3] Many courts have held that teachers have standing under the Rehabilitation Act when they are retaliated against for advocating for disabled students. *See, e.g., Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126 (10th Cir. 2010)*; Barker v. Riverside Cty. Office of Educ.*, 584 F.3d 821 (9th Cir. 2009)*; Molloy v. Acero Charter Sch., Inc.*, No. 19 C 785, 2019 WL 5101503, at *2 (N.D. Ill. Oct. 10, 2019) (collecting cases). CTU, however, does not allege retaliation.

jurisdiction to decide its jurisdiction, so it can address a motion for a preliminary injunction without making a conclusive decision about whether it has subject matter jurisdiction"). But even though these findings are preliminary, they cast serious doubt on CTU's ability to obtain relief on the merits. *Girl Scouts*, 549 F.3d at 1086.

### 2. *CTU is Unlikely to Succeed Under the APA*

As with standing, CTU is also unlikely to succeed on the merits of its claim under the APA. CTU's sole count, apparently brought against all defendants, is entitled "[v]iolation of Section 706 of the Administrative Procedure[s] Act." R. 1. Having chosen to proceed as it has, however, CTU faces several hurdles arising from well-established agency defenses under the APA.

A plaintiff who brings a claim under the APA may challenge only "final agency actions." *Bennett v. Spear*, 520 U.S. 154, 178, 117 S. Ct. 1154, 1169, 137 L. Ed. 2d 281 (1997). At least at this preliminary stage, the Court doubts that CTU can succeed in showing that the Secretary's refusal to seek additional waiver authority was a final agency action. This doubt arises principally from the effect of *Dalton v. Spencer*, in which the Supreme Court held that military base closure recommendations made by the Secretary of Defense were not final agency actions that could be challenged under the APA. 511 U.S. 462, 469-70 (1994); *see also Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) ("tentative recommendation" from Secretary of Commerce to the President was not final agency action). In *Dalton*, the Supreme Court concluded that the recommendations were not final agency actions because (1) the President is not an "agency" as that term is defined by the APA; and (2) the recommendations were

17

not binding on the President, who had complete discretion to accept or reject them. 511 U.S. at 471; *see also Franklin*, 505 U.S. at 798.

That reasoning applies equally here. Final action on any recommendation by the Secretary must come, if at all, from Congress. But like the President, Congress is not an "agency" under the APA. 5 U.S.C. § 701(b)(1)(A) (" 'agency' means each authority of the Government of the United States, whether or not it is within or subject to review by another agency, but does not include—(A) the Congress"). And as in *Dalton* and *Franklin*, the Secretary's recommendation here would not be binding on Congress. Accordingly, *Dalton* (which CTU has not addressed) and *Franklin* likely preclude CTU from making the required showing that the Secretary's recommendation constituted reviewable final agency action. *Cf. Ecology Ctr., Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 925 (9th Cir. 1999) ("courts have recognized that agency recommendations are not reviewable as final agency actions"); *Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S.E.P.A.*, 313 F.3d 852, 861 (4th Cir. 2002) ("if we were to adopt the position that agency actions producing only pressures on third parties were reviewable under the APA, then almost any agency policy or publication issued by the government would be subject to judicial review").

Even if the Secretary's recommendation letter were a final agency action, her decision to include (or not include) specific waiver recommendations is likely committed to her discretion. Under the APA, decisions that are "committed to agency discretion by law" are unreviewable. 5 U.S.C. § 701(a)(2). This limitation on judicial review, to be sure, is "a very narrow exception" that applies only when there is "no

law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *Dep't of Commerce v. New York*, 139 S. Ct. at 2568 (" . . . we have read the § 701(a)(2) exception for action committed to agency discretion quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion") (internal quotations omitted). To determine whether Section 701(a)(2) applies, courts analyze the governing statutes and regulations to assess whether there are "judicially manageable standards . . . for judging how and when an agency should exercise its discretion." *Menominee Indian Tribe of Wis. v. Envtl. Prot. Agency*, 947 F.3d 1065, 1072 (7th Cir. 2020) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). CTU bears the burden of showing that the exception does not apply. *Heckler*, 470 U.S. at 828 ("before any review at all may be had, a party must first clear the hurdle of § 701(a)").

Section 3511 of the CARES Act, the sole relevant provision, states that the Secretary "shall prepare and submit a report . . . with recommendations on any additional waivers . . . the Secretary believes are necessary to be enacted into law to provide limited flexibility to States and local educational agencies to meet the needs of students during the emergency." CARES Act, Div. A § 3511(d)(4). CTU calls this a "substantive . . . judicially manageable standard against which the Secretary's actions can be measured," R. 21 at 10, but the Court disagrees. A vague statement of purpose does not create a judicially manageable standard that the Court can apply. *Buntrock v. U.S. S.E.C.*, No. 02 C 1274, 2003 WL 260681, at *4 (N.D. Ill. Feb. 6, 2003*),*

*aff'd sub nom. Buntrock v. S.E.C.*, 347 F.3d 995 (7th Cir. 2003) (governing rules that "only modestly constrain agency action . . . provide no basis by which th[e] Court can review the agency's discretionary decision"); *see also Matthews v. Town of Greeneville*, 932 F.2d 968 (6th Cir. 1991) ("vague admonition to maintain 'the lowest possible rates' does not come close to providing the sort of guidelines which would permit meaningful judicial review"); *Elecs. of N. Carolina, Inc. v. Se. Power Admin.*, 774 F.2d 1262, 1266 (4th Cir. 1985) (statutory requirement that agency market power for "most widespread use" was "too vague to provide a standard by which a court c[ould] review" agency's marketing plan); *Aharonian v. Gutierrez*, 524 F. Supp. 2d 54, 55 (D.D.C. 2007) (decision committed to agency discretion where "the only statutory standard is vague and highly subjective").

Because of the extremely general wording of Section 3511, and in view of the cases cited above, the Court finds that CTU is unlikely to succeed in convincing the Court that the broad language of Section 3511(d)(4) provides sufficient guidance for the Court to assess the Secretary's exercise of discretion. *See Jaymar-Ruby, Inc. v. F.T.C.*, 651 F.2d 506, 511 (7th Cir. 1981) (FTC's decision to disclose investigative file to state attorneys-general was committed to agency discretion where, "[o]ther than requiring that such information be maintained in confidence and be used only for official law enforcement purposes, the statute is silent on what factors should be considered by the Commission in reaching its decision"); *Singh v. Moyer*, 867 F.2d 1035, 1037 (7th Cir. 1989) (decision not to waive foreign residency requirement committed to agency discretion); *Muscogee (Creek) Nation Div. of Hous. v. U.S. Dep't*

*of Hous. & Urban Dev.*, 698 F.3d 1276, 1281 (10th Cir. 2012) (statutory restriction on agency discretion was too broad to support judicial review "unless the agency action can be considered irreconcilable with this statutory mandate") (quotations omitted).

At bottom, the Secretary's recommendations required "a complicated balancing of a number of factors which are peculiarly within [her] expertise." *Heckler*, 470 U.S. at 831. This is, therefore, the type of situation where "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id*. at 831–32.[4] CTU does not cite, and the Court is not aware of, any case where an agency was found to have abused its discretion by failing to ask Congress for the power to waive existing statutory mandates. And it is unlikely that CTU could develop a record here such that the Court would be inclined to break new ground. For these reasons, CTU has not shown some likelihood of success on the merits. *Girl Scouts*, 549 F.3d at 1085–86.

### 3. *CTU is Unlikely to Succeed Against the Board*

CTU is also unlikely to succeed in its claim against the Board. To begin, the Court is unsure what claim is presented against the Board. CTU contends that the

---

[4] Although not raised by the parties, and accordingly not central to this ruling, the political question doctrine is relevant to the Court's concerns about its competence to judge the Secretary's actions. Under that doctrine, there exist two types of questions not subject to judicial resolution: (1) those where "the relevant considerations are beyond the courts' capacity to gather and weigh"; and (2) those that "have been committed by the Constitution to the exclusive, unreviewable discretion of the executive and/or legislative—the so-called 'political'—branches of the federal government." *Miami Nation of Indians of Indiana, Inc. v. U.S. Dep't of the Interior*, 255 F.3d 342, 347 (7th Cir. 2001) (internal citations omitted). There is little doubt in the Court's mind that the question of what policies are needed to address the COVID-19 crisis is inherently committed by the Constitution to the legislative and executive functions.

Board is an "indispensable party" under Rule 19 of the Federal Rules of Civil Procedure, but the indispensableness of the Board to this case is not readily apparent. Rule 19 "requires the court to determine whether a party is indispensable." *Wade v. Hopper*, 993 F.2d 1246, 1249 (7th Cir. 1993) (citing *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118–19 (1968)). The test for an indispensable party "is whether justice cannot be done unless [the party] is joined." *Id.* (quotation omitted). It is the party advocating for joinder that "generally has the initial burden to establish the absent person's interest." *In re Veluchamy*, 879 F.3d 808, 819 n.4 (7th Cir. 2018).

CTU contends in conclusory fashion that the Board is indispensable, but CTU has neither explained the basis for joining the Board nor cited any rule or other authority that requires joinder. CTU has, therefore, failed to show that joinder is required. *Wade*, 993 F.2d at 1249 ("Simply quoting Rule 19's language is inadequate").

Even assuming the Board is a necessary party, CTU's complaint contains only a single count brought under the APA. That count does not address the Board's conduct, and it does not purport to allege that the Board is susceptible to relief under the APA. Neither does the single count of the complaint purport to state a cause of action under the CARES Act, the IDEA, or the Rehabilitation Act. Accordingly, the Court questions whether it could even issue an injunction in the absence of a stated claim directed to the Board's conduct.

22

More pertinently, given that the cause of action is pleaded under the APA, CTU has little likelihood of success against the Board. As a threshold (and likely determinative) matter, the Board is not an "agency" under APA. 5 U.S.C. § 701 (" 'agency' means each authority of the Government of the United States. . . ."). CTU has also not shown, nor even clearly alleged, that the Board wrongly interpreted the IDEA or Section 504. Such a claim would, in any event, run counter to CTU's pleaded theory, which is that a waiver of the IDEA is needed to relieve CTU from the IDEA's regulatory burden. If a waiver was not imperative, it would be unnecessary to coerce the Secretary into seeking a waiver from Congress.

Though mindful not to distort CTU's complaint, the Court tends to agree with the Federal Defendants' characterization of this dispute as fundamentally an "employer-employee dispute." (R. 20 at 13.) It may be that CTU's grievances are more accurately viewed as relating to its members' terms and conditions of employment, and it may be that CTU believes the Board is violating its members' rights under their collective employment agreement. Perhaps recognizing that such a claim could likely not be brought in federal court, CTU has not alleged any employment-related violation, and the Court must constrain itself to the pleadings and documents CTU has filed. But it remains that CTU has not identified the basis of its claim against the Board.

A final point concerning the claim against the Board: during the June 12 motion hearing, counsel for CTU urged the Court to issue, in effect, a declaratory judgment to "clarify" the requirements of the IDEA regarding whether and when

IEPs must be revised to account for remote learning. Such a ruling might help resolve the parties' dispute, to be sure, but the Court does not believe it has the power to issue a declaratory judgment under these circumstances. To begin, this case was not brought as a declaratory judgment action under 28 U.S.C. § 2201; it was brought principally under the APA. For this reason alone, the Court is reluctant to offer an abstract opinion on the requirements of the IDEA.

Perhaps more importantly, CTU has not identified a claim *against the Board* that arises under federal law. CTU might contend that its defense to the Board's requirements concerning IEP revisions arises under federal law (namely, the IDEA and Section 504), but that is insufficient to confer jurisdiction. As the Seventh Circuit has explained, to determine whether federal jurisdiction exists over a request for a declaratory judgment, the Court "must dig below the surface of the complaint and look at the underlying controversy. If a well-pleaded complaint by the defendant (the 'natural' plaintiff) would have arisen under federal law, then the court has jurisdiction when the 'natural' defendant brings a declaratory-judgment suit." *NewPage Wis. Sys. Inc. v. United Steel, Paper & Forestry*, 651 F.3d 775, 777–78 (7th Cir. 2011).

Digging below the surface, the Court cannot discern a likely federal claim by the Board. Presumably the Board, acting as a "natural plaintiff," could bring a state-law contract claim if CTU members failed to complete the IEP revisions; and CTU might then assert a defense that the Board misunderstands the IDEA and Section 504. But that would not constitute a well-pleaded complaint, for a federal defense to

24

a claim does not confer jurisdiction. *Wis. Interscholastic Athletic Ass'n v. Gannett Co.*, *Inc.*, 658 F.3d 614, 619 (7th Cir. 2011). Accordingly, the Court cannot issue what would amount to an advisory opinion on the federal requirements for IEPs. *See Deveraux v. City of Chicago*, 414 F.3d 328, 331 (7th Cir. 1994) (affirming dismissal of declaratory judgment action and explaining that "Article III prohibits federal courts from issuing advisory opinions").

CTU has not, of course, brought an action for a declaratory judgment; this discussion thus serves only to reinforce that CTU has little likelihood of success against the Board. To reiterate, CTU has not pleaded an identifiable, standalone claim against the Board. To the extent that it has, CTU is unlikely to succeed because the APA does not apply to the Board. Finally, the Court assumes that it lacks jurisdiction to issue a declaration concerning the effect of the IDEA and Section 504 on the revision of IEPs.

### B.    Other Factors Relevant to Injunctive Relief

It is with the likelihood of success analysis that the resolution of this motion effectively begins and ends. In the interest of completeness, however, the Court briefly addresses the other factors relevant to whether preliminary injunctive relief is warranted.

At the threshold stage, in addition to some likelihood of success, CTU must also show that it will suffer irreparable harm before final resolution of its claims and that traditional legal remedies would be inadequate. *Girl Scouts*, 549 F.3d at 1085–86. With only a few days remaining before the end of the school year, it is doubtful

that CTU can make any meaningful showing of irreparable harm. In addition, because CTU purports to bring this action principally for the benefit of students and parents, it is doubtful that the CTU members' injuries, which likely relate to the terms and conditions their employment, are irreparable through the application of traditional legal remedies. *See id*. Despite these doubts, however, the Court will assume for purposes of this order that CTU has made an adequate showing of irreparable harm and lack of an adequate remedy.

Having determined that CTU has failed to demonstrate some likelihood of success, the Court "must deny the injunction." *Girl Scouts*, 549 F.3d at 1086 ("If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction"). As a result, the Court need not "proceed[] to the balancing phase of the analysis." *See id*.

But again in the interest of completeness, the Court will briefly address the second-stage factors. These include a balancing of the parties' respective harms and, where appropriate, a consideration of "any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Id*. at 1085-86 (citation and quotation marks omitted).

In short, the Court finds that the balance of harms does not tip so strongly in favor of CTU as to justify an injunction. In making this finding, the Court has employed the "sliding scale" approach that takes into consideration the relative merits of the case. *Id*. (citation and quotation marks omitted). Because of the surpassingly low likelihood that CTU will succeed on the merits, CTU must make a

compelling argument concerning the balance of harms. But as explained above, any harm suffered by CTU's members likely could be remedied adequately through damages or prospective injunctive relief. Stated differently, the potential harm to CTU if an injunction is not entered is not so great as to, by itself, make up for the serious weaknesses inherent in CTU's case.

Conversely, there is potential harm to the Board and the Federal Defendants if an injunction is entered. An order directing the Board to cease requiring the revision of IEPs or directing the Secretary to ask Congress for a waiver she has already rejected would amount to a significant judicial intrusion into the workings of two separate governmental entities. *Cf. Missouri v. Jenkins*, 515 U.S. 70, 99 (1995) ("[O]ur cases recognize that local autonomy of school districts is a vital national tradition") (citations omitted). In the light of the weakness in CTU's case, the Court is not inclined to take that step. *See Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986) (the Court must exercise its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case"). Accordingly, to the extent that the second-stage balancing test is required, the Court finds that an injunction is not warranted.

## IV.    CONCLUSION

Like a thief in the night, the novel coronavirus has crept upon our Nation and wreaked widespread havoc. It is beyond dispute that this crisis has generated significant challenges for all; for many, the results have been tragic. Virtually every

aspect of life has been and continues to be affected. As with all crises, however, selflessness has abounded. Health care workers, first responders, and many others have given greatly of themselves, often at significant personal risk, to ensure that the sick are treated, the public is protected, and essential services are provided. It is altogether fitting that these public servants have been widely and publicly recognized.

But not all public servants are quite so visible or recognized quite so publicly, even though their work is critically important too. CTU's members—the case managers, teachers, clinicians, and others who provide daily instruction to children with special education needs—are striving to meet the challenges of providing instruction under unique and trying circumstances. Along with the parents and guardians of their young charges, these public servants are the boots on the ground, so to speak, in the effort to ensure that our more vulnerable students continue to receive the education to which they are entitled. They too deserve the recognition—and gratitude—of society. That the Court is unable to grant the relief their representatives seek should be read neither to discredit their substantive views on remote learning nor to call into question their manifest dedication to duty.

As explained above, however, this action suffers from legal deficiencies that preclude preliminary injunctive relief. CTU's motion for a temporary restraining order and preliminary injunction is therefore denied.

SO ORDERED.

Date: June 19, 2020

_____
JOHN F. KNESS
United States District Judge